THE STATE v. INHABITANTS OF THE COUNTY OF HUDSON.

1. The inhabitants of counties were not indictable at common law for not repairing bridges over canals, but only bridges over rivers.
2. The inhabitants of counties in this state are not indictable for not repairing bridges over rivers in this state.

On *certiorari* and motion to quash indictment.

In 1862, at the Court of Oyer and Terminer in and for the county of Hudson, a bill of indictment was found against the inhabitants of the county for not repairing a certain common and public bridge over the Morris canal, in said county, being a common highway, which had become dangerous to pass, and which the county was bound to repair.

The indictment having been removed into this court by *certiorari*, a motion was made to quash it, on the ground that it set forth no indictable offence.

The motion was argued by *A. O. Zabriskie*, for plaintiff in *certiorari*. *I. W. Scudder*, for the State.

The opinion of the court was delivered by

VREDENBURGH, J. The defendants move to quash this indictment, on the ground that in New Jersey the inhabitants of a county are not liable to indictment for not repairing bridges. The indictment avers that, from the 1st January, 1861, there was and is a certain common and

public bridge over the Morris canal, in said county, being a common highway, which bridge is and was broken and dangerous for want of necessary repairs, so that the citizens cannot pass without danger, and that the inhabitants of the county have been and still of right are bound to repair it, to the common nuisance of said citizens.

The defendants now move to quash this indictment, upon the ground that the inhabitants of the county are not bound to repair it.

This leads to the following inquiries :

1st. Were the inhabitants of a county, at common law, bound to repair public bridges?

2d. If they were, was that common law adopted in this state?

3d. If it was not, has any such liability been created by our statutes?

Were the inhabitants of counties in England, by their common law, liable to repair public bridges?

This is too well settled by authority and the judicial history of England to be questioned. Indeed, I do not understand it, on this motion, to have been seriously contested.

The authorities upon this subject are abundant. 2 *Institutes* 700, 701 ; *Croke Charles* 365 ; *Langforth bridge case,* 2 *East* 342, 356 ; 5 *Burrows* 2594. So ancient in this doctrine, that the statute of 22 Henry VIII., recognizing the principle, has always been held as but declaratory of the common law. It was evidently originated in times of much higher antiquity.

2d. Was this principle of the common law adopted in this state? The body of the common law, so far as it was adapted to our circumstances, undoubtedly was. But an examination of the early legislation of this colony will show, I think, that the principle now in question was an exception to the general rule. The first act relating to the subject was passed by East Jersey in 1682, *Leam. & Spicer*, page 257, which provided that in and through the province all necessary highways, bridges, &c., from and after 1682, for

travelling, shall be laid out through every county by certain persons (naming them), and that the said highways and bridges are and shall be accounted to belong to the said respective county, and shall be made, maintained, repaired, and kept up at the charge of every respective person, town, or township to whom or where they are most serviceable or do or shall most immediately belong or appertain.    In 1686, the legislature of East Jersey appointed other persons to supply the place of those who in the meantime had died.    In the same year, 1686, another act was passed, *Leam. & Spicer* 294, entitled an act for rates for highways, reciting that whereas it is provided by act, that certain persons be appointed in each county for the laying out of highways and bridges, and no provision is yet made for empowering the inhabitants of each town or hamlet to make assessments for defraying the charge, provides that the inhabitants of each town or hamlet, or out plantations, by warrant from justices of the peace of such town or hamlet, choose four or five inhabitants, who shall have power to make such taxes for erecting and maintaining bridges; so that in East Jersey, at least so early as 1682 and 1686, the repairing of bridges was charged not upon the inhabitants of the county, but upon those of the townships, and put, as it rightly should be, upon the same footing as highways.

In 1694, *Leam. & Spicer* 346, reciting the act of 1682, the legislature appointed other persons in the place of those named in the act of 1682, who had in the meantime died.

By an act passed in West Jersey in 1684, before West Jersey was yet divided into counties (*Leam. & Spicer* 493), the building and repairing of roads and bridges were made chargeable upon each respective tenth.    Counties were not mentioned in New Jersey till 1694.    *Leam. & Spicer* 530. So that, up to the surrender in 1703, the charge of repairing bridges, by express enactment in East Jersey, was upon the towns, and in West Jersey upon the tenths, and not upon the inhabitants of the counties.    After the surrender in 1718, 1 *Nevill* 84, the legislature passed an act entitled " an act for

the building, rebuilding, repairing, or amending of bridges in the respective towns and precincts within this province," and which act minutely regulated the whole subject of bridges, charges their repairs expressly upon the towns, and provides all the machinery for the collection of the necessary taxes. This principle is further recognized by the act passed in 1723. 1 *Nevill* 168, § 9.

That the repairing of bridges by the general laws of the province was chargeable upon the towns, and not upon the counties, is expressly recited in the act of the legislature passed 1741. 1 *Nevill* 275. It is an act entitled " an act for building, rebuilding, and repairing bridges in the county of Essex," and recites—whereas the district of Acquackanonck, in the county of Essex, is for a considerable space in length bounded on the river Passaic, which divides Essex from Morris and Bergen, over which river several very large bridges are already built, and more may be hereafter necessary, the one half of the expense whereof the inhabitants of said Acquackanonck are by *the general laws of the province liable to,* whose situation being very peculiar, the taxes on the said inhabitants are much greater than those of the other townships of Essex, whereupon the inhabitants of Acquackanonck have prayed relief.

The act then charges the expense of all building and repairing such bridges and the whole of the expenses of all other bridges upon the whole county of Essex.

Nothing can be plainer than that, at the passage of this act in 1741, no such common law was recognized in West Jersey as made the repairing of bridges chargeable upon the counties. By the act passed in 1760, 2 *Nevill* 356, § 25, 26, 27, it was still recognized as the general law, that the repairing of bridges was chargeable upon the townships, and such general law is altered in several respects by said act. The 25th section of this act, reciting—that whereas there are many . bridges within this province which belong to particular towns and precincts to amend and repair, which cannot be sufficiently repaired by day labor without

the assistance of particular handicraftsmen, be it enacted, that where there are *any bridges in any* of the *towns* within the counties of Burlington, Somerset, Gloucester, Salem, Cumberland and Sussex, which cannot well be repaired by day laborers, that the overseers, &c., shall contract with tradesmen and have them built, and collect the money from the towns where they are located; and the 27th section of the same act, reciting, that whereas the following counties, Middlesex, Monmouth, Essex, Bergen, Hunterdon and Morris, have formally requested, and some have by their humble petition, presented to the house this session, desired that all bridges requiring handicraft work may be *built, rebuilt, repaired, and amended at the sole charge and expense of the whole county* where such bridges do lie, enacted that all bridges within said counties last aforesaid that require handicraft work and shall want repairing, that the freeholders shall contract and assess the costs upon the inhabitants of the counties. So that in 1760, at the passage of this act, no such common law as that the inhabitants of counties were chargeable for the repairs of bridges existed. If the county became responsible it was by force of the statute, and not of common law. This act remained in force until 1774, when it was repealed by the act entitled an act for regulating roads and bridges. *Allinson's Laws* 386, § 46. This act of 1774, sections 27 and 28, copies very nearly the recitations in the act of 1760, showing that then, if the counties were chargeable at all, it was by force of statutory law, and not at common law.

Two years after came the Revolution and the first constitution of this state. This provides that so much of the statute law and the common law of England as had been used here should *continue* in force. As no English statute had ever charged the repairing of bridges upon the inhabitants of the counties of this colony, but, on the contrary, the statute of this colony had for an hundred years charged it upon the townships, of course neither the statute of 22 Henry VIII., nor any other English statute, affected the question; and as

no principle of the common law, in the presence of these colonial statutes, could have made the counties chargeable. there was, at the adoption of the constitution of 1776, no such English common law to be continued. If, therefore, the inhabitants of counties are chargeable for the repair of bridges in the townships it must be by force of some colonial or state statute.

It is a principle of the common law which has been adopted in this state, that where any duty to the public is imposed either by the common or statute law the party so charged is indictable for neglect. If either the common or statute law imposed upon the inhabitants of counties the duty to repair bridges, they are indictable if they allow them to go out of repair. But we have seen that the common law imposed no such duty, because the statute law of the colony placed that duty on the townships.

The only question remaining is, has any colonial or state statute imposed that duty, so as to make the whole of the inhabitants of a county indictable?

The inhabitants of the counties in England were indictable by virtue of two principles of the common law. The first was, that the common law imposed the duty upon all and every inhabitant of the county, jointly and severally, to keep the bridges in repair. The second was, that if they did not perform this duty they were indictable. Here, in this state, we have seen that the common law imposed no such duty on the inhabitants, and consequently, then, the principle that they could be indicted did not apply. But it may be said here, that although no common law imposes such duty, yet that a statute does, and they therefore are indictable; so that the question is, does any statute in New Jersey re-enact the common law of England, and impose it as a duty upon the inhabitants of a county to repair the bridges? The duty should be plainly and directly imposed before we should decide that it does. For what are the consequences? This principle of the common law, that it was the duty of the inhabitants of counties to repair, was a duty imposed by virtue

State v. Hudson County.

of their inhabitancy, and in case of neglect, all and each, collectively or individually, could be indicted, and each one was liable in his own person and property to punishment as for a nuisance. The indictment and conviction operate the same as if each one was named in the indictment, and they are not named only because of the inconvenience of the thing. Each inhabitant of the county, upon conviction, is liable to be sent to the state prison for two years as for a nuisance. As Chief Justice Holt said in the case of *Regina* v. *The Inhabitants of the County of Wilts*, 6 *Mod.* 307, "If the order to repair be not obeyed, an attachment may issue against the inhabitants of the whole county, and catch as many as one can of them ;" and among the first of whom, I might add, might probably be the prosecutor of the pleas of the county of Hudson.

Our statutes must therefore, to sustain this indictment, charge the repair of bridges as a personal duty upon all and each of the inhabitants of the county, as a personal obligation. Such was the principle of the common law, and it was because of such a principle that they were indictable. Now had we any such statutes in force when this crime of omission, now complained of in 1860–1, was committed?

The first act to which our attention has been called, is the one incorporating the board of freeholders. *Nix. Dig.* 109.* This act has been in force, substantially as it is now, since 1794. If this act had said that the inhabitants of the counties shall repair bridges, it would have re-enacted the common law of England, and each man in the county would have been indictable for their want of repair.

But this act does no such thing. It first incorporates the board of freeholders, and then gives them power to raise such sums of money for repairing bridges as they shall deem adequate and proper. Now is it not patent, at the first glance, that this is an entirely different thing from making it the duty of the inhabitants to repair bridges ? So far from doing so, it places the duty, if anywhere, upon the freeholders, not upon the inhabitants.

* *Rev.*, p. 127.

Suppose the freeholders raised as much as they should deem adequate and proper, did the act mean to make every inhabitant of the county indictable because somebody else might think some other sum adequate and proper? or, if they did not raise as much as they thought adequate and proper, that the inhabitants were to be indicted for the corruption of the board of freeholders; that one set of men should commit the crime, and another set suffer the punishment?

But again, if the inhabitants are indictable under this act for not repairing bridges, they are also liable to indictment because the board do not purchase, build, and repair poor-houses, jails, court-houses, and a variety of other matters, which are all put by the act upon the same footing. It is apparent that the object of this act, so far from being designed to re-enact the old common law principle making it the duty of the inhabitants, as individuals, to repair bridges under the penalty of indictment, was enacted to provide machinery to answer the public purposes without that principle.

But it is said that the freeholders are but the agents of the county to repair, and if they do not, the inhabitants must. That is assuming that the inhabitants are liable at common law, which we have shown not to exist. So far as the statute is concerned, they are not agents of the county. They are chosen by the towns, and are created by the legislature a tribunal to tax the inhabitants at their discretion; and because they have the power to tax the inhabitants more or less, are the inhabitants indictable because opinions may differ as to the amount the freeholders, in the fair discharge of their duty, ought to tax? The freeholders are agents of the county, not as constables and other township officers are agents; and we might just as well indict all the inhabitants of a county because a constable will not serve a warrant or a justice of the peace hear a cause.

We are next referred to the statute concerning bridges, *Nix. Dig.* 79.* This act has also substantially been in force since 1798. It provides that when bridges are to be built or repaired, the overseers of the highways are to give notice to

*Rev., p. 84.

the board of freeholders, or part of them, and then the free-holders are to decide upon the matter, and if to build, to pay the expenses out of the county funds. How this provides that the inhabitants shall be indictable for not repairing, is more than I can see. If they, under this statute, are indicta-able for not repairing, they are also indictable for not build-ing, which was never the case at common law. But how is it, or why is it, that because the freeholders are to *decide* whether they will repair or not, and to pay out of the county funds if they do decide to repair, that the inhabitants are in-dictable if the freeholders decide the one way or the other?

The truth of the whole matter is obviously this: by the common law of England, the inhabitants of counties, from time immemorial, had been charged for the repair of bridges within their bounds, and were indictable in the King's Bench for not doing so. They were not indictable as a corporation, but individually and by reason of their inhabitancy of the county, like hundreds were under the constitution of king Alfred, for a loss within their bounds by robbery. This was an inconvenient arrangement. The inhabitants had no, or very inconvenient, machinery to raise the money or fine among themselves. The sentence went against them indi-vidually, and enforced against the first the officers could catch, and kept on till the bridge was repaired; and those who were so unlucky as to be caught had to get contribution from the rest of the inhabitants as best they could. Then came the statute of 22 Henry VIII., upon which have been built and framed all the acts passed both in England and this state since, and by paring, chipping, and patching which our own present statutes have been formed. The statute of 22 Henry VIII. had two objects in view; one was to give the Quarter Sessions jurisdiction over indictments at common law for not repairing bridges, and so bring justice near the people; and the other was to provide convenient machinery to raise taxes to repair bridges, and by that means prevent the necessity of indicting the inhabitants for not repairing.

The statute of 22 Henry VIII. consequently left there un-

touched the common law principle, that the inhabitants of counties should repair, and gave, first, jurisdiction to the Quarter Sessions, as well as the King's Bench, to try and present the inhabitants for not repairing; and second, by giving to certain officers power to raise taxes to repair bridges. This statute consequently left the inhabitants of counties in England liable to indictment if for any reason the bridges were not repaired.

But when this colony began to be settled, almost the first thing they did was to relieve the inhabitants of counties from the obligation to repair, by putting it on the townships, and so the liability remained here for an hundred years, and until the Revolution.

The statute of 22 Henry VIII. provided a tribunal to adjudicate if the repairs were necessary before the tax to repair was ordered, and these matters were modified by subsequent English statutes. The first attempt on the part of this colony to assimilate our legislation to that of England was the act of 1760.

Our legislature, from time to time since 1760, have attempted to further assimilate our legislation on this subject to that of England, and of which the statute of 22 Henry VIII. is the groundwork. But in all our attempts, we have assiduously and always ignored the principle of holding the *inhabitants of counties* responsible for repairs. Finding, in 1760 and since, that this liability had always been on the townships, our legislatures have merely followed the statute of 22 Henry VIII. so far as to provide a tribunal to decide upon the necessity of the repair and the machinery for the necessary taxation. The consequence was, that as the statute of 22 Henry VIII. found the inhabitants of the county in England responsible for repairs, it left them so, and our statutes finding them not responsible, left them so, and both provided a tribunal to decide upon their necessity and the machinery to collect the necessary taxes. Thus the colonial acts of 1760 and of 1774 required the justices of certain of the counties to decide upon the necessity of the repair, and

then ordered the freeholders absolutely to repair. This might have made the freeholders liable to indictment, but certainly could not make the inhabitants of the county liable. But whether it did or not, these acts were repealed in 1798 by the acts now in force.

The laws now in force, *Nix. Dig.* 110 and 79,* substitute the board of freeholders in the place of all the other machinery in the act of 22 Henry VIII. for adjudicating if the repairs be necessary, and upon the amount and the raising of the tax; and all the rest of the statute of 22 Henry VIII. affirming the common law liability of the inhabitants of the county is certainly left out, showing that the legislature never meant to re-enact in this state the liability of the *inhabitants* of counties, but to place the whole matter of *building*, as well as repairing bridges, under the discretion of a tribunal created by themselves for that purpose.

This legislation might, perhaps, have relieved the inhabitants of *townships* from the liability of indictment for not repairing, but could not thereby impose any such consequences upon the inhabitants of *counties*. The question whether the inhabitants of townships or the board of freeholders can be indicted for not repairing bridges, is not now before us, and all we could say upon these subjects would be mere *dicta*. We only wish not to be considered as acquiescing in the *dicta* in the books, that the board of freeholders may be indicted.

But it appears to me, that there is another fatal defect upon the face of this indictment. It charges that the bridge over the Morris canal is out of repair, and that the inhabitants of Hudson are bound to repair. Now, supposing the old English common law to be in force here, what authority, ancient or modern, can be found that all the inhabitants of a county, at common law, were indictable for not repairing a bridge over a canal? A bridge over a canal is not such a bridge as the inhabitants, at common law, were indictable for not repairing. Canals are devices contrived long after this common law was made. A bridge, in the technical

* *Rev.*, pp. 127, 84.

State v. Jersey City.

meaning of the common law, *ex vi termini*, was a structure for passage over a river, not over a ditch.

The old indictment used to run, that a certain "*pons super flumen*" was out of repair—a structure over running water—and these words are left out of the more modern indictments only because it was supposed that the term bridge meant *ex vi termini pons super flumen*.

A canal is of nearer kin to ditch than it is to a run. It is nothing more nor less than obstruction to the highway, and its repair can only be a question between the township or the board of freeholders and the canal company, and not between the canal company and the inhabitants of the county.

The inhabitants of counties were never responsible at common law for artificial obstructions in a highway, and bound to build bridges over them under penalty of indictment. They are not bound to build bridges by force of the common law of England over walls, or railroads, or gutters, or ditches, or mere puddles, but over those obstructions in highways arising from flowing waters.

The only bridges they were bound to repair were *pontes super flumina*.

CITED in *Whitall* v. *Freeholders of Gloucester*, 11 *Vroom* 306.